**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BRETOUS, SAMANTHA<br><br>Plaintiff,<br><br>-against-<br><br>INTUIT INC.<br><br>Defendant. | ECF Case No.<br><br>COMPLAINT AND JURY DEMAND |

Plaintiff Samantha Bretous, by and through her attorneys, Working Solutions PLLC, alleges upon personal information and belief as follows:

**PRELIMINARY STATEMENT**

1. Plaintiff Samantha Bretous ("Ms. Bretous" or "Plaintiff") brings this action against her former employer, Intuit Inc. ("Intuit" or "Defendant"), for interfering with her medical leave to treat a disability and retaliating against her for taking it, resulting in her termination. Plaintiff also asserts claims for gender discrimination relating to disparate pay practices, performance criticism, project assignment, and shunning in the workplace which impacted Plaintiff's opportunities.

2. Defendant's treatment of Ms. Bretous violates the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 et seq., the Equal Pay Act of 1963, 29 U.S.C. §

206(d) ("EPA"), the New York State Human Rights Law, Executive Law §§ 290-301 et seq. ("NYSHRL"), the New York City Human Rights Law, Title 8 of the Administrative Code of the City of New York, § 8-107 et seq. ("NYCHRL"), and New York Labor Law § 194 ("NYLL").

3. Plaintiff seeks damages for unlawful FMLA interference and retaliation, for sex and disability discrimination under the NYSHRL and NYCHRL, and for unequal pay because of sex under the EPA and NYLL § 194.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiff's state law and city law claims brought under the NYSHRL, the NYCHRL, and the NYLL pursuant to 28 U.S.C. § 1367.

5. This Court has jurisdiction over Plaintiff's claims because this action involves questions regarding the deprivation of Plaintiff's rights under federal law, including the FMLA and the EPA.

6. Venue is proper in the United States District Court, Southern District of New York pursuant to 28 U.S.C. § 1391, because Defendant maintains a place of business in this district and the events and omissions which give rise to Plaintiff's claims occurred in this district.

7. During the relevant period, Plaintiff worked from New York City.

8. Contemporaneously with the filing of this Complaint, Plaintiff is serving a copy on the New York City Commission on Human Rights and the Corporation Counsel of the City of New York, as required by N.Y.C. Administrative Code § 8-502(c).

## PARTIES

9. Plaintiff resides in New York, New York. She joined The Rocket Science Group LLC ("Mailchimp") in August 2018 and, following Intuit's acquisition of Mailchimp, was employed and paid by Intuit. She held the Staff Software Engineer role from February 1, 2024 until her employment ended on May 5, 2025.

10. Defendant Intuit Inc. ("Intuit" or "Defendant") is a Delaware corporation with offices at 51 Astor Place, New York, New York 10003. Intuit was Plaintiff's employer during the relevant period.

## FACTUAL ALLEGATIONS

### Employment History and Compensation

11. Plaintiff, a woman and qualified software engineer, joined Mailchimp as an Engineer II in August 2018. She was promoted to Engineer III in September 2019 and Senior Engineer in January 2021, and remained employed after Intuit acquired Mailchimp on November 1, 2021.

12. In February 2022, Plaintiff transferred to the Short Message Service ("SMS") team under Erika Peltz ("Ms. Peltz"), a woman. She earned a "highly effective" rating in 2022 and, on July 31, 2023, an "Exceeded Expectations" rating with a 115% Individual Performance Incentive ("IPI") of $35,626 and $136,000 in restricted stock units ("RSUs").

13. Saikat Mukherjee ("Mr. Mukherjee"), a man, became SMS engineering director in January 2024. Plaintiff was promoted to Staff Software Engineer on February 1, 2024, specializing in frontend development. At promotion, engineering lead[1] Jeremey

---

[1] A "lead" describes a supervisory but non-managerial level relationship over other engineers. Leads supervise projects and write code themselves.

Nofzinger, a man, praised her leadership, initiative, and efforts to align work across squads.

14. On July 10, 2024, Intuit announced plans to cut 10% of its workforce, prioritizing employees rated "Does Not Meet Expectations" ("DNME"). Mr. Mukherjee became Plaintiff's direct manager on July 12.

15. On July 23, 2024, Plaintiff received a "meets expectations" rating, a 75% IPI, and $87,000 in RSUs. Her total compensation fell by approximately $56,000 from the prior fiscal year, despite her promotion. Mr. Mukherjee controlled incentive and equity awards. Upon information and belief, male comparators under his supervision who received the same "meets expectations" rating, or the equivalent "achieves expectations" rating, received 95% IPI payouts. Upon information and belief, those male comparators did not receive similar reductions in their RSU grants.

16. On August 12, 2024, Plaintiff transferred to the First Time Use team[2], renamed Onboarding, under Kranti Thirunagari ("Mr. Thirunagari"), a man. On September 16, she began a high-priority Homepage performance assignment[3] at the CTO's direction.

**Medical Leave and Performance Criticism by Mr. Thirunagari**

17. On Monday, September 16, 2024, two business days after a therapy session at which leave was discussed, Plaintiff requested FMLA leave through Defendant's leave administrator, Aflac, to treat depression, which her provider assessed as moderately severe to severe. On her therapist's recommendation, she planned to return on Wednesday, October 23.

---

[2] The FTU team is responsible for designing, building, and optimizing the onboarding experience for new users to capture and entice them to continue using the product.

[3] Homepage refers to the main landing screen that users see after logging into the product, or the primary dashboard that drives user engagement.

18. Aflac approved FMLA leave from September 23 through October 22, 2024, for "Employee's Own Illness or Injury," approved short-term disability benefits under Intuit's plan, and notified Intuit of its decision. Defendant approved the leave without objecting to its timing.

19. Mr. Thirunagari acknowledged Aflac's notice of the leave dates and told Plaintiff he needed more advance notice.

20. On September 20, Mr. Thirunagari reprimanded Plaintiff for giving one week's notice, contrasted it with the four months he had given for his own leave, and said that with earlier notice he would have sought to defer another Staff Engineer's transfer off the team.

21. Defendant's medical-leave policy asked employees to "Try to give 30 days' notice, if possible." After the reprimand, Plaintiff no longer felt safe discussing her health needs with leadership.

22. Plaintiff returned to work on October 23, 2024.

23. Defendant's guidance set a fourteen-day target for P2 defects, measured from the date a ticket is created. A ticket created on October 15, 2024, while Plaintiff was on FMLA leave, was designated P2 on October 25 and assigned to her through the on-call rotation on October 29, the day its target expired. Most of that period ran while she was on leave. The defect affected a small number of users in a feature scheduled to be removed within approximately one month.

24. Plaintiff resolved the ticket within six days. On October 31, she told Mr. Thirunagari she would submit the fix with unit tests to follow, and he replied, "sounds good." On the morning of November 1, a day off she had scheduled in advance, she

arranged the code review. The change was approved that day and closed by QA on November 4.

25. From October 23 through October 25, her first days back from FMLA leave, Plaintiff worked with Mailchimp and Intuit engineers assessing adoption of LEGO technology. On November 4, she was excluded from the meeting presenting that work's progress to leadership.

26. Before her leave, Plaintiff had been assigned, at the CTO's direction, to a high-priority Homepage performance project. Defendant never returned her to it. Instead, it gave Homepage performance work to Raghavendra Bokka ("Mr. Bokka") and David Hernquist, male Staff Engineers who joined Onboarding in November 2024, and excluded Plaintiff from Homepage meetings.

27. On November 18, Plaintiff asked Mr. Thirunagari whether she might receive a midyear DNME rating. Mr. Thirunagari identified two concerns: the P2 ticket, whose target had expired before it was assigned to her, and that she had not given him enough notice of her FMLA leave. Mr. Thirunagari thus named Plaintiff's FMLA leave as a basis for a potential negative rating.

**Performance Assessments and Assignments under Mr. Kumar**

28. Siddhartha Kumar ("Mr. Kumar"), a man, replaced Mr. Thirunagari as Plaintiff's manager around November 25. In December, he assigned her low-impact work, such as renaming files. On December 10, every engineer on the team received a significant new-project assignment except two: Plaintiff, who had recently returned from FMLA leave, and an engineer who was about to begin parental leave.

29. On December 18, Mr. Kumar, who had supervised Plaintiff for less than a month, delivered her mid-year trending rating, placing her between DNME and "Achieving Expectations." He said "pretty much everything" he was sharing came from her previous managers, including a feedback document a previous manager had shared during the week of November 4, and that "I was not your manager back then, so I have to take it at face value." He added that her recent promotion combined with a DNME trend did not look good on paper.

30. His written recap stated that Plaintiff had "committed to rolling in the change by Thursday 10/30 EOD," gave no updates, and went out of office without a handoff, causing a missed SLA. October 30, 2024 was a Wednesday; Plaintiff made no such commitment; Mr. Thirunagari approved her plan on October 31; she arranged the code review before her day off; and the target had expired on the day the ticket was assigned to her.

31. The recap also criticized Plaintiff's Slack responsiveness, relying on feedback from her past BetterWorks check-ins with earlier managers.

32. In the same meeting, Mr. Kumar told Plaintiff that her main area for improvement was understanding the homepage and its performance. When she asked whether he wanted her on other work, he told her to continue the flag cleanup.

33. On January 8, 2025, Plaintiff wrote to Mr. Kumar that "[a]fter returning from medical leave, I was assigned this urgent P2 issue with a shorter-than-standard deadline," and asked for guidance and for examples supporting his Slack expectations. From then on, Mr. Kumar knew she had taken medical leave. His January 9 reply did not address her leave or the deadline and gave no examples.

34. Mr. Kumar redirected Plaintiff's proposed Homepage performance work to cleanup tasks and, on January 10, told her to ask Mr. Bokka what she could help with.

35. In January, Mr. Kumar told Plaintiff not to pursue a LESS-to-CSS cleanup she had asked approval to join, and she stopped. He later cited her interest in it as poor prioritization.

36. On January 15, Mr. Kumar dismissed Homepage performance work as unproductive, a month after naming it her main area for improvement. He agreed that the team's lack of projects was a serious problem and acknowledged that the team had launched only one project successfully.

37. In the same meeting, Mr. Kumar said that every engineer started from scratch, and that of positive feedback about an engineer, "I won't just take that at face value." A month earlier, he had adopted Plaintiff's previous managers' negative feedback without question.

38. On January 29, Mr. Kumar told Plaintiff that a planned modular homepage "can be the best opportunity" for her, given her frontend strength, but also said, "I don't want you to be actively collaborating on all of the projects." He approved a Knowledge Engine proof of concept that Plaintiff had proposed.

39. On February 5, Mr. Kumar called that proof of concept "the kind of feathers which you need to have on your hat from a Staff lens," and said her draft goals were heading in the right direction.

40. The next day, in her written mid-year review, Mr. Kumar confirmed the trending DNME rating. He wrote that she "has not delivered any significant project" since joining OBX, a period that included her FMLA leave, and that "[h]er better works goals are not

meeting the bar of a staff eng." He faulted her for waiting to be told what to do, though his December 18 recap had told her to consult him on tasks and he had told her not to collaborate on all projects. He again relied on past feedback and wrote that the rating was subject to change.

41. Upon information and belief, calibration targeted approximately eight percent of employees for DNME ratings.

**The March Warning and Subsequent Work**

42. On March 10, 2025, Mr. Kumar told Plaintiff that Defendant's Performance Advisory Team had asked about her DNME status. He assigned her two projects, Wix Entrypoint and enhanced form discoverability, to complete largely on her own by March 31, and warned that missing those dates could mean an exit for every employee tagged DNME at mid-year.

43. Mr. Kumar described both projects as low in complexity, calling the forms project "really, very easy," and said he had hoped to give her a more complex project that was not ready. Two days later, his written warning described the same projects as "handpicked considering your craft skills, scope and impact." At her termination, he called them work "an Engineer Level 2 should be looking into."

44. He told her that delivering on time would not mean she was "out of the danger zone," and that leadership repeatedly asked why the team's own Staff Engineers were not included in homepage initiatives, work Plaintiff had been kept from since her leave.

45. On March 12, Mr. Kumar issued a written warning requiring delivery of both projects by March 31 and warning of possible termination without a PIP.

46. Mailchimp's written Progressive Discipline Process provided that discipline ordinarily proceeds through coaching, a verbal warning, a written warning, and a final written warning or PIP; that similar situations should be "handled the same way every time, regardless of who did it"; and that "[a]ny deviation . . . must be reviewed with Director level management and People Operations." Upon information and belief, that policy, or a materially similar one, applied to Plaintiff. The policy page was last modified on March 6, 2025, six days before the warning, and is now archived. Plaintiff received no PIP or final written warning.

47. Plaintiff was excluded from a March 19 Staff Engineer presentation on personalization work. Upon information and belief, a female engineer was told in late March that promotion submissions lacked bandwidth, and Nick Boyle ("Mr. Boyle"), a male Senior Engineer, was promoted to Staff after Plaintiff's separation.

48. On March 24, Mr. Kumar praised Plaintiff's management of both projects. He acknowledged that her workload of nineteen story points per week was unhealthy, and asked her to use her camera more, a request not made of male Staff Engineers. Product set the release for April 7, and Mr. Kumar accepted that date.

49. The March 26 assignment table listed Plaintiff for Wix Entrypoint and Forms Phase 1, Staff Engineer Mr. Bokka for Modular Homepage, and Senior Engineer Mr. Boyle for AI ML Carousel. Upon information and belief, Modular Homepage involved Principal Engineers. Two months earlier, Mr. Kumar had offered the modular homepage to Plaintiff.

50. On April 2, Mr. Kumar told Plaintiff he was very happy with her management of both projects and that she had delivered what he hoped to see. Both features were released on April 7.

51. Afterward, Mr. Kumar assigned Plaintiff little or no new work while Mr. Bokka continued strategic assignments. During the April 21 hackathon, Plaintiff collaborated on a project later praised by the CTO and CEO.

**Termination**

52. On April 30, 2025, Mr. Kumar informed Plaintiff that leadership had decided to terminate her employment effective May 5. He acknowledged improvement but cited broader Staff-level gaps in leadership, communication, pace, scope, and cross-functional impact following organizational calibration involving Principal Engineers and earlier feedback. He described her as a "very solid Senior Engineer" and attributed her promotion to her former manager, saying "she may not have realized" the Staff-level performance expectations.

53. Mr. Kumar said the decision took into account her mid-year check-in and her "feedback when you were with a different manager." By his own account, that mid-year rating rested on her previous managers' feedback, including Mr. Thirunagari's. He also said the decision followed a ranking of Staff Engineers across the organization. Plaintiff was the only woman among the five Staff Engineers on OBX.

54. Defendant had already rated Plaintiff "meets expectations" as a Staff Engineer in July 2024. Her promotion was not Ms. Peltz's decision alone: it required a VP/SVP review, an organization-level talent review, and approval by leadership including the

CTO, under criteria requiring "[n]o significant gaps across rubric characteristics of target level." Mr. Kumar had no role in it.

55. In or around April 2024, Mr. Mukherjee likewise blamed Ms. Peltz, a woman whose employment had ended on March 6, 2024, for promoting Plaintiff. Upon information and belief, Mr. Kumar never worked with Ms. Peltz. Mr. Kumar's April 30 statement repeated Mr. Mukherjee's criticism.

56. Plaintiff's termination followed the departures of other senior women in the organizations where she worked. Ms. Peltz was terminated on March 6, 2024. Giselle Valenzuela, a woman who became Plaintiff's manager in March 2024, and another female second-level manager in Mr. Mukherjee's department were laid off on July 10, 2024. Upon information and belief, Defendant separated women in senior engineering and engineering-management roles at a higher rate than men in those roles.

57. Mr. Kumar also said leadership would ask why Plaintiff was not involved in every team project, although he had told her in January not to collaborate on all of them.

## FIRST CAUSE OF ACTION

### FMLA Interference

58. Plaintiff incorporates paragraphs 1 through 57.

59. Plaintiff was an eligible employee under 29 U.S.C. § 2611(2)(A), having been employed for more than twelve months and having worked more than 1,250 hours during the twelve months preceding her leave. Defendant employed more than 50 employees within 75 miles of Plaintiff's worksite and was a covered employer under 29 U.S.C. § 2611(4)(A).

60. Plaintiff was entitled to FMLA leave for her depression, a serious health condition, and took approved leave from September 23 through October 22, 2024.

61. Defendant interfered with Plaintiff's FMLA rights, in violation of 29 U.S.C. § 2615(a)(1), by (a) failing to restore her to the high-priority Homepage performance assignment she held before her leave, or to equivalent duties and responsibilities, as required by 29 U.S.C. § 2614(a)(1) and 29 C.F.R. § 825.215, and by continuing to deny her that work after her return, including when Defendant gave the Homepage performance work to Mr. Bokka and Mr. Hernquist in November 2024 and excluded her from Homepage meetings; when, on December 10, 2024, Defendant gave every engineer on the team a significant new-project assignment except Plaintiff and an engineer about to begin parental leave; when, on December 18, 2024, Mr. Kumar named Homepage performance her main area for improvement but directed her to continue flag cleanup; when, in January 2025, Mr. Kumar redirected her proposed Homepage performance work to cleanup tasks and, on January 10, 2025, told her to ask Mr. Bokka what she could help with; and when, by March 26, 2025, Defendant assigned the Modular Homepage project to Mr. Bokka after Mr. Kumar had offered it to Plaintiff on January 29, 2025, each of which was a separate denial of the restoration to which she was entitled; (b) holding her responsible for a defect target that ran mostly while she was on leave and expired the day the ticket was assigned to her; and (c) using her FMLA leave, including the timing of her leave notice, as a negative factor in her performance assessment, as prohibited by 29 C.F.R. § 825.220(c).

62. Plaintiff gave notice of her need for leave as soon as practicable, as 29 C.F.R. § 825.303 requires, and Defendant approved the leave.

63. Defendant's violations were willful. Defendant knew, or showed reckless disregard for whether, its conduct violated the FMLA. Defendant administered Plaintiff's leave through its leave administrator, Aflac, which approved the leave and notified Defendant, and Defendant approved the leave without objecting to its timing. Defendant's own policy asked employees only to "[t]ry to give 30 days' notice, if possible." Nevertheless, on September 20, 2024, Mr. Thirunagari reprimanded Plaintiff for the timing of her approved leave notice, and on November 18, 2024, he identified that notice as a basis for a potential negative rating. On January 8, 2025, Plaintiff told Mr. Kumar in writing that, after returning from medical leave, she had been assigned the P2 issue with a shorter-than-standard deadline. Mr. Kumar did not address her leave, confirmed the trending negative rating on February 6, 2025, and, on April 30, 2025, confirmed that the termination decision took into account that rating and her feedback from prior managers, including Mr. Thirunagari. Defendant thus acted with knowledge of Plaintiff's protected leave and of her written objection to its treatment in the performance process, and did not correct course.

64. As a result, Plaintiff lost the assignment and the opportunity to demonstrate Staff-level scope and impact, received negative performance assessments, and was terminated. She suffered lost wages, benefits, and other monetary losses, and seeks the relief authorized by 29 U.S.C. § 2617, including liquidated damages, interest, and reasonable attorneys' fees and costs.

## SECOND CAUSE OF ACTION

### FMLA Retaliation

65. Plaintiff incorporates paragraphs 1 through 57 and the coverage and entitlement allegations in paragraphs 59 and 60.

66. Defendant retaliated against Plaintiff for using approved FMLA leave by subjecting her to adverse treatment, including a negative performance rating, marginalization within her team, and termination. The leave-notice comments, Mr. Kumar's reliance on prior managers' feedback, and the disputed performance explanations described above support the connection between her protected leave and those actions.

67. Mr. Kumar had supervised Plaintiff for less than a month when, on December 18, he rated her trending toward DNME. He admitted that "pretty much everything" in that assessment came from "your previous managers" and that he had to "take it at face value." That feedback included Mr. Thirunagari's assessment, which Mr. Thirunagari had expressly tied to Plaintiff's FMLA leave. By adopting it, Mr. Kumar, and the decision-makers who later relied on that history in calibration and termination, acted on Mr. Thirunagari's retaliatory motive. On April 30, 2025, Mr. Kumar confirmed that the termination decision took into account her mid-year check-in and her feedback from prior managers. Defendant is liable for the resulting adverse actions under a "cat's paw" theory. Plaintiff's FMLA leave was at least a motivating factor in her negative ratings, marginalization, and termination.

68. Defendant's actions were willful and violated 29 U.S.C. § 2615(a)(1), including the prohibition on retaliation for exercising FMLA rights reflected in 29 C.F.R. § 825.220(c). Defendant's managers expressly tied Plaintiff's protected leave to her

performance assessment, Plaintiff objected in writing on January 8, 2025, and Defendant nonetheless relied on that assessment to terminate her. For the reasons alleged in paragraph 63, Defendant knew, or showed reckless disregard for whether, its conduct violated the FMLA.

69. As a result, Plaintiff suffered lost wages, benefits, and other monetary losses. She seeks the relief authorized by 29 U.S.C. § 2617, including applicable interest, liquidated damages, and reasonable attorneys' fees and costs.

## THIRD CAUSE OF ACTION

### Disability Discrimination under the NYSHRL

70. Plaintiff incorporates paragraphs 1 through 57.

71. Plaintiff's depression, which her provider assessed as moderately severe to severe, is a mental impairment demonstrable by medically accepted clinical diagnostic techniques and is a disability under N.Y. Executive Law § 292(21). Defendant approved her medical leave, Mr. Thirunagari knew of that approval, and the requested leave constituted a reasonable accommodation. Defendant knew of Plaintiff's disability, or perceived her as disabled, through her approved medical leave, its leave administrator's approval of disability benefits under Defendant's own short-term disability plan, of which the administrator notified Defendant, and her January 8, 2025 written statement to Mr. Kumar that she had returned from medical leave.

72. Defendant discriminated against Plaintiff because of her actual or perceived disability, including by using her disability-related leave against her in the performance process and terminating her employment. The leave-notice comments, subsequent

adverse assessments, disputed explanations, and termination are described in the factual allegations above.

73. As a direct and proximate result, Plaintiff suffered emotional distress, reputational harm, and other compensable injuries. She seeks the remedies available under the NYSHRL, including compensatory and punitive damages, attorneys' fees, and costs.

**FOURTH CAUSE OF ACTION**

**Disability Discrimination under the NYCHRL**

74. Plaintiff incorporates paragraphs 1 through 57.

75. Plaintiff’s depression is a mental and psychological impairment and a disability under N.Y.C. Administrative Code § 8-102. Defendant approved her medical leave, Mr. Thirunagari knew of that approval, and the leave constituted a reasonable accommodation. Defendant knew of Plaintiff’s disability, or perceived her as disabled, through her approved medical leave, its leave administrator’s approval of disability benefits under Defendant’s own short-term disability plan, of which the administrator notified Defendant, and her January 8, 2025 written statement to Mr. Kumar that she had returned from medical leave.

76. Defendant treated Plaintiff less well in the terms and conditions of her employment and terminated her because of her actual or perceived disability, including its adverse use of her disability-related leave in the performance process, in violation of the NYCHRL.

77. As a direct and proximate result, Plaintiff suffered emotional distress, reputational harm, and other compensable injuries. She seeks the remedies available under the NYCHRL, including compensatory and punitive damages, attorneys' fees, and costs.

## FIFTH CAUSE OF ACTION

### Sex Discrimination under the NYSHRL

78. Plaintiff incorporates paragraphs 1 through 57.

79. Plaintiff is a woman, is a member of a protected class under the NYSHRL, and was qualified for her position. Defendant discriminated against her because of sex in compensation, performance assessments, assignments and opportunities, workplace treatment, and termination.

80. The compensation comparisons, exclusion from significant assignments and meetings, favorable opportunities afforded to male engineers, and disputed performance explanations described above reflect unequal treatment because of sex. Mr. Bokka, a male Staff Engineer on Onboarding, received the Homepage assignments Plaintiff was denied and was not terminated. Plaintiff was the only woman among the five Staff Engineers in the OBX organization under Mr. Thirunagari and Mr. Kumar. Her treatment formed part of a broader pattern of less favorable treatment of women.

81. Upon information and belief, no women in the SMS organization were nominated for promotion during Mr. Mukherjee's one-year tenure as director.

82. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff suffered and continues to suffer emotional distress and other compensable harm. She seeks the relief authorized by the NYSHRL.

## SIXTH CAUSE OF ACTION

### Sex Discrimination under the NYCHRL

83. Plaintiff incorporates paragraphs 1 through 57 and the allegation concerning promotion nominations in paragraph 81.

84. Plaintiff is a woman and was qualified for her position. Defendant treated her less well because of sex by providing unequal compensation, restricting significant assignments and opportunities, issuing discriminatory performance assessments, subjecting her to differential workplace treatment, and terminating her employment, in violation of the NYCHRL.

85. The compensation and assignment comparisons, favorable treatment of male engineers, and alleged pattern concerning women described above support Plaintiff's claim of sex-based differential treatment. Mr. Bokka, a male Staff Engineer on Onboarding, received the Homepage assignments Plaintiff was denied and was not terminated. Plaintiff was the only woman among the five Staff Engineers in the OBX organization under Mr. Thirunagari and Mr. Kumar.

86. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff suffered and continues to suffer emotional distress and other compensable harm. She seeks the relief authorized by the NYCHRL.

**SEVENTH CAUSE OF ACTION**

**Unequal Pay under the Equal Pay Act, 29 U.S.C. § 206(d)**

87. Plaintiff incorporates paragraphs 1 through 57.

88. At all relevant times, Defendant was an employer within the meaning of 29 U.S.C. § 203(d) and an enterprise engaged in commerce within the meaning of 29 U.S.C. § 203(s), and Plaintiff was an employee within the meaning of 29 U.S.C. § 203(e)(1).

89. Defendant paid Plaintiff wages, including Individual Performance Incentive payments and restricted stock unit awards, at a rate less than the rate at which it paid male employees in the same establishment for equal work on jobs the performance of which

required equal skill, effort, and responsibility, and which were performed under similar working conditions, in violation of 29 U.S.C. § 206(d)(1).

90. Upon information and belief, the male comparators described in paragraph 15 were engineers in Mr. Mukherjee's organization who held the Staff Software Engineer position, or engineering positions with substantially equal duties, and who were evaluated and compensated under the same rating, incentive, and equity framework as Plaintiff. Although those comparators received the same or an equivalent performance rating, Defendant paid them a 95% IPI and RSU grants without reductions comparable to Plaintiff's, while it paid Plaintiff a 75% IPI and reduced her RSU grant from $136,000 to $87,000.

91. Plaintiff and the male comparators worked within a single organization under common management, and Mr. Mukherjee centrally controlled the incentive and equity awards at issue. Upon information and belief, Plaintiff and the male comparators therefore worked in the same establishment within the meaning of the EPA.

92. The pay differential was not based on a seniority system, a merit system, a system that measures earnings by quantity or quality of production, or any factor other than sex. Defendant assigned Plaintiff and the male comparators the same or equivalent performance ratings, yet paid Plaintiff less.

93. Each payment of compensation reflecting the sex-based differential constituted a separate violation of 29 U.S.C. § 206(d)(1).

94. Defendant's violations were willful. Defendant administered a structured compensation framework that tied incentive payouts to performance ratings, knew that Plaintiff and the male comparators held the same or equivalent ratings, and nevertheless

paid Plaintiff a lower incentive percentage and a reduced equity award. Defendant knew, or showed reckless disregard for whether, its conduct violated the EPA, and the three-year limitations period of 29 U.S.C. § 255(a) applies.

95. As a result, Plaintiff suffered lost wages and other compensation. Under 29 U.S.C. §§ 206(d)(3) and 216(b), she seeks her unpaid wages, an equal additional amount as liquidated damages, and reasonable attorneys' fees and costs.

## EIGHTH CAUSE OF ACTION

### Unequal Pay under New York Labor Law § 194

96. Plaintiff incorporates paragraphs 1 through 57 and paragraphs 89 through 92.

97. At all relevant times, Defendant was an employer, and Plaintiff was an employee, within the meaning of New York Labor Law §§ 2 and 190.

98. New York Labor Law § 194(1) prohibits an employer from paying an employee, because of her status within a protected class, including sex, a wage at a rate less than the rate paid to employees without such status in the same establishment for (a) equal work on a job the performance of which requires equal skill, effort, and responsibility, and which is performed under similar working conditions, or (b) substantially similar work, when viewed as a composite of skill, effort, and responsibility, and performed under similar working conditions.

99. Defendant violated New York Labor Law § 194 by paying Plaintiff, because of her sex, a lower Individual Performance Incentive payout and a reduced restricted stock unit award relative to male employees who performed equal or substantially similar work under similar working conditions.

100. The differential was not based on a seniority system, a merit system, a system that measures earnings by quantity or quality of production, or a bona fide factor other than status within a protected class that is job-related and consistent with business necessity, as New York Labor Law § 194(1)(d) requires.

101. Defendant's violations of New York Labor Law § 194 were willful. Plaintiff's claims are timely under the six-year limitations period of New York Labor Law § 198(3).

102. As a result, Plaintiff suffered lost wages and other compensation. Under New York Labor Law § 198(1-a), she seeks the full amount of her underpayment, liquidated damages of up to three hundred percent of the underpayment for Defendant's willful violations, prejudgment interest, and reasonable attorneys' fees and costs.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests the following relief to the extent authorized by the applicable statutes:

a. An award of actual damages for lost wages and benefits, health insurance premiums, back pay, and front pay, in amounts to be determined at trial;

b. An award of unpaid wages and compensation under the EPA and New York Labor Law § 194;

c. An award of liquidated damages under the FMLA, the EPA, and New York Labor Law § 198(1-a);

d. An award of compensatory damages under the NYSHRL and NYCHRL;

e. An award of prejudgment and post-judgment interest;

f. An award of punitive damages under the NYSHRL and NYCHRL;

g. An award of costs and expenses, including reasonable attorneys' fees and expert fees to the extent authorized by law; and

h. Such other and further relief as the Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Under Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues so triable.

Dated: October 23, 2026
New York, New York

/s

Christopher Q. Davis
Working Solutions Law Firm, PLLC
11 Grand Central East, Floor 16
New York, NY 10017
646-430-7930
cdavis@workingsolutionsnyc.com